## McKinney *vs* Pope's Administrator.

ERROR TO THE FAYETTE CIRCUIT.

*Gaming.    Equity Jurisdcition.*

CHANCERY.

Case 30.

*September* 29.

JUDGE MARSHALL delivered the opinion of the Court.

BRUCE, as administrator of Pope, having recovered a judgment against McKinney and his sureties, on a note executed by them, McKinney filed his bill alledging that

The case stated.

Pope had, at divers times, won from him at games of cards, and received large sums of money, and praying that the judgment may be injoined to the amount of the sums thus won and received. The bill also attempts to show that a part of the consideration of the note on which the judgment was obtained, was also vicious, as founded on a gaming transaction. But the transaction out of which the debt arose, appears to have been substantially this. that McKinney being indebted to McAdams $900 for money won, Pope, at the suggestion of McAdams and to enable McKinney to pay said $900, which he knew to be a gaming debt, cashed a large note which McKinney held, paying to him the amount in money after deducting at the rate of 10 per cent. per annum for the time the note had to run, and that McKinney paid $900 of the sum thus received, to McAdams. McKinney having afterwards collected the amount of the note sold to Pope, and having paid over but a part of the proceeds, executed his own note for the residue, and the note sued on at law was executed in renewal and continuation of this last named note.

Should this even be deemed a loan by Pope to McKinney, made for the purpose of enabling him to pay the amount previously lost, to McAdams, there is certainly no statute which makes such a loan illegal, or which prohibits a recovery by the lender. And a Court of Equity which refuses to avoid a security given for money loaned for the purpose of being staked at the game, would find no ground in its own principles for avoiding a security given for money loaned to pay a debt founded on previous gaming. We regard the transaction, however, not as a loan but as a purchase of the note held by McKinney—and as it does not appear that Pope had any interest in the debt to McAdams, either when it was lost at gaming or when it was paid, we do not perceive that his purchase of the note, though made with the view of enabling McKinney to pay the debt, should be vitiated by the nature of the consideration on which that debt was founded. Nor in this view of the case has McKinney any right to claim any reduction of the judgment, on the ground of the rate of discount allowed on the purchase of the note.

Money loaned to pay off a debt founded on a gaming consideration, will not be withheld from the lender at the instance of the borrower.

The sale of the note at a discount exceeding the rate of six per cent. was not usurious.

It is further alledged in the bill, that the note on which the judgment was obtained includes usurious interest calculated on the amount of the previous note, in renewal of which it was executed; which being admitted in the answer, there is nothing left in making a disposition of this part of the case, but to calculate the legal interest upon the previous note up to the time when the last note fell due, and by adding it to the principal of the previous note, fix the sum for which, with interest thereon from the time when the last note fell due, the judgment, if there were no other ground for reducing its amount, should have been effectual.

But the principal question in the case is, whether McKinney has a right, in equity, to set-off against the judgment the sums lost by him and paid to Pope, and which have no connection with the judgment or the note on which it was founded. And this question resolves itself into the inquiry whether, as the law now stands, a Court of Equity will or can entertain a bill to recover money lost at gaming? We say as the law now stands, because the act of 1833, (*Statute Law*, 758,) was obviously intended to effect, and has effected a radical change in the law on the subject, and in the rights of the parties to a gaming transaction. And this is the first case in which the right of the loser to sue in Equity for money lost and paid, since the passage of that act, has come directly in question in this Court.

By the common law, wagers were valid contracts, legally enforcible, and the Court of Equity did not interfere, except on the ground of some hardship or imposition in the particular case. And even after gaming contracts of a certain description were prohibited, relief was refused in equity after payment of the money by the loser, on the ground, (as stated by Lord Talbot in *Bosanquet* vs *Dashwoood*, Cases Temp. Talbot, 41,) that both parties are criminal. And if two persons will sit down and endeavor to win of one another, and one pays the money, if after payment he cannot recover it at law, a

McKINNEY
*vs*
POPE'S ADM'R.

May money lost at gaming since the statute of 1833 (*Stat. Law,* 758,) be recovered in chancery?

By the common law, wagers were valid, and Courts of Equity did not interfere, except on the ground of hardship or fraud to prevent a recovery.

McKinney
vs
Pope's Adm'r.

Nor after payment thereof to enforce its payment because *in pari delicto potior est conditio pendentis.*

Court of Equity has nothing to do but to stand neuter, there being in that case no oppression on the party.

In the case of *Downs* vs *Quarles*, &c. decided in this Court before the enactment of the statute of 1833, the bill did not make out a case authorizing a recovery under either of the statutes of 1798 and 1799, then in force, which gave the right to recover money lost at gaming. And the Court, after showing this to be the case, state the enquiry to be, "whether equity will decree money to be restored which has been paid on a gaming contract, to recover which the statutes afford no remedy." This question was decided in the negative, on the ground of the general principle, that the parties being equally guilty, the one who had fulfilled the contract by payment, should not be aided in recovering the money back, according to the maxim, *in pari delicto potior est conditio defendentis.* And although it was admitted that the statutes against gaming should receive such construction as would best suppress the mischief, it was doubted whether this would most surely be effected by compelling the winner to disgorge his illegal gains, or by permitting the loser who had paid, to abide by his loss. Wherefore, it was concluded, that neither a Court of Law nor of Equity should interfere between gamesters, further than to permit the possessor to retain what he had, and to enforce the penalties imposed by statute.

In the case of *Downs* vs *Quarles*, the bill alledged the necessity of a discovery, which possibly might have been deemed a ground for taking jurisdiction, if there had been a legal remedy under the statutes. But the question formally stated by the Court, after showing that there was no remedy under the statutes, seems to relate to the general power and jurisdiction of a Court of Equity to decree the restitution of money paid on a gaming contract, which question is unaffected by the mere fact that a discovery might or might not be necessary in the particular case; the solution of the question is made to turn, not upon the want of jurisdiction in the Court to decree the money to the loser, if he had been equitably entitled to it, but upon the absence of a right to recover, arising from the equality of his guilt, and upon the doubtful propriety,

with a view to the policy of suppressing the vice of gaming, of restoring to the loser the money which he has paid.

That under the statutes then existing, this equality of guilt was properly imputed to the two parties, and that under those statutes there may have been ground to doubt as to the propriety of the winner's being compelled to restore his gains to the loser, as a means of enforcing the purpose of these enactments, need not now be questioned. Penalties had been imposed in certain cases, upon both winner and loser, and although by the acts of 1798 and 1799, an action was allowed to recover money won and paid under particular circumstances, the recovery was allowed rather on the ground of a forfeiture than of any recognized right in the loser, or from any favor to him. By both statutes any body might sue; the exclusive right being reserved to the loser by the act of 1798, for ten days only, and the action itself being limited to three months from the time of payment; while by the act of 1799, though the action was left to the general limitation, no exclusive right was reserved to the loser, and one half of the recovery, by whomsoever the suit might be brought, was appropriated in aid of the county levy. And each of these acts prescribes the form of the remedy by which the recovery is to be sought.

*The statute of 1798 and 1799, gave an action for money won and paid under particular circumstances—by the act of 1798, the exclusive right reserved to the loser for ten days, others limited to 6 months; but by that of 1799, the action was left subject to the general limitation of five years, and no exclusive right reserved to the loser, one half to go in aid of the county levy the other to the person suing.*

In none of these statutes does the Legislature seem decidedly to interpose in behalf of the loser, as one who, from the circumstance of being the loser, is presumed to have been oppressed, defrauded, or imposed on. In none of them is the policy of restoring the loser to his money decidedly asserted as a means of suppressing the mischief of gambling; and in these respects we think the act of 1833 has introduced new principles which have at once changed the attitude and rights of the parties, and determined in favor of the propriety of restoring the lost money to the loser. The preamble of that statute declares the inefficiency of the laws then existing, and the first provision for the more effectual prevention of the mischief, is to authorize a suit by the loser, *his heirs or executors,* at any time within five years after the payment of the money or other property lost, and if he do not sue

*The provisions of the statute of 1833, establishes in behalf of the loser the right to recover back the thing lost & paid, on the presumed ground of fraud or oppression (and the imputation of equal guilt cannot be relied on,) and on this ground Courts of Equity may decree the re-payment of money lost at gaming and paid over.*

within six months, the right of action and recovery is given to any person who may first sue. Here is not only an extension of the exclusive right of suit given to the loser, but in authorizing his heirs and executors to sue, there is a clear recognition of a peculiar right in him which does not belong to others, but which, if he chooses to assert it, resides in him as in a person illegally deprived of his property; and the same idea is kept up in the 8th section, which authorizes a creditor of the loser, who is so at the time of the gaming, or before the property lost is delivered to the winner, to levy his execution on it or to subject it by a suit in Chancery, as in case of a fraudulent conveyance. Now whatever may be said of the equality of guilt in the mere act of gaming, which may depend upon the nature of the game, the inducements held out by one or the other of the parties, and their comparative skill, we think it clear that this statute, (which contains many highly penal enactments,) intended not only to punish gaming of certain descriptions as an offence, and to prohibit all betting on games—but that as one efficient means of preventing betting, which is the great evil of gaming, it recognizes and establishes, *sub modo*, the right of the loser in the money or property lost, holds out inducements for the assertion of that right which it extends to his representatives and his creditors—and thus, (so far as that right is concerned,) clearly discriminates between the loser as such, and the winner. Certainly, as between them, the act means to favor the loser. It favors him by allowing him a preference to others to recover back what he has lost. If he be thus favored, on the ground of presumed oppression or fraud upon him, then the law itself establishes in his behalf, these grounds of equitable jurisdiction and relief. The imputation of equal guilt cannot be effectually made against him whom the law regards as oppressed or defrauded in the guilty transaction, and to whom it intends to afford protection. Or if he be not favored as the presumed victim of fraud or oppression, but because the recognition of his right to be restored to the lost money or property, considering the motives which will probably impel him to seek its recovery in the course of five years, are deemed by the Legis-

lature important means of effecting the public objects of the statute. Then the question whether the objects of the statute will be promoted by restoring to the loser his losses is closed, and the Courts, both of law and equity, are bound to advance the object by using their appropriate powers in advancement of the means adopted by the Legislature.

As a question of mere reason and expediency, we should have little doubt that a recognition of the right of the loser to be restored to his money or property lost at gaming, would tend greatly to the suppression of gambling. As a question of construction of the statute of 1833, we have no doubt that the recognition of this right was adopted in that statute as a means of prevention more efficient than the forfeitures and popular actions under the previous acts. And the individual right being thus established by law as a means of suppressing an enormous public mischief, and of restoring to an individual that of which he has been illegally, if not fraudulently deprived, we feel bound, in construing the statute so as best to suppress the mischief, to construe it so as best to support the right which it has established as a means of suppressing the mischief.

Whatever then may have been the case prior to the statute of 1833, we are of opinion that since that act, the prohibition against gaming itself, and the laws for its suppression, are to be understood as having for their object in part, the protection of the person who may lose; that the act of 1833 especially intends to protect and relieve the loser, upon the presumption generally true, in fact, and which is established by the statute, that he has been defrauded, oppressed, or imposed on; that it intends to relieve him by enabling him to reclaim that of which he has been illegally deprived, and that it looks to this right of reclamation, to the assertion of which he may be impelled by much stronger motives than any which might operate on the public at large, as a powerful means of suppressing a mischief necessarily ruinous to many individuals, and deeply injurious to the body of society. The statute then, has not only removed all the objections to the granting of relief, by restoring the loser to his mo-

ney, which are stated by this Court in the case of *Downs* vs *Quarles, &c.* and by Lord Talbot in *Bosanquet* vs *Dashwood,* but has placed the claim of restitution on the ground of relief from fraud and oppression, and on the still broader ground that the public itself is to be relieved from a great evil through the relief to be granted to the party. And on either of these grounds, the Court of Equity may, and often does grant relief in other cases not only by setting aside the agreement or other transaction, but by ordering a re-payment of money paid under it: 1 *Story's Equity*, 297, and authorities cited, *Ib.* 265, and cases cited. The Court then has jurisdiction to grant this relief in the case of gaming, by analogy, and because it has jurisdiction in like cases. And it is not too liberal a construction of the statute, which gives the right to sue "in any Court having jurisdiction in like cases," without intimating any preference for the remedy at law, to say that as the Court of Equity had jurisdiction in like cases, the right of suing in that forum as well as in the Court of Law, is expressly given by the statute. It may be added that it has been maintained by eminent jurists, that independently of any statutory provision for the recovery of money lost at gaming, it should be recoverable back, because it is in furtherance of a great public policy: 1 *Story's Equity*, 303, and consequently that the Court of Equity should have granted such relief.

With regard to the time within which the suit is to be brought, we are of the opinion, that the statute in referring to five years, should be construed as subjecting this remedy to the general limitation of five years, as applicable to suits upon simple contracts, and as placing the limitation on the same footing as in other cases. Whence it follows, that in case of the death of the party originally liable, the six months during which his personal representative is exempt from suit, is to be added to the five years as in other cases. It is sufficiently proved, that the intestate, Pope, had won and received six hundred dollars, on two occasions near each other, and both within five years and six months, and probably within five years before the filing of the bill; and that he, in partnership with another person, won and received four hundred dol-

*The general statute of limitations governs the time of bringing suits at law and in Chancery for recovering money, &c. lost at gaming.*

lars, certainly within the five years, of which $200 may be presumed to have been his separate interest. We should not hesitate to grant the relief sought, to the extent of eight hundred dollars, were it not that the claim for money lost and paid to Pope, is limited in the original bill to $700, and the allegations of the amended bill seeming to enlarge this claim, are too vague to be the foundation of a decree. The claim, therefore, must stand as in the original bill, and must limit the extent of the relief to be granted on this ground. The partner of Pope, in winning the $400, was not a necessary party. 1, Because the Court would not enter into a settlement of such a partnership, unless absolutely necessary for the ends of justice—and 2, Because, from the nature of the transaction, there is a sufficient presumption, that there was an immediate division of the spoils, and that Pope received one half for his share.

The Circuit Court having refused all relief, on the ground of the money lost and paid to Pope, and having also allowed too small a sum for the usury in the note sued on, by erroneously assuming that more was due when that note was executed than appeared to be due by the note, for the renewal of which it was given, therefore, the decree is reversed and the cause remanded with directions to render a decree perpetuating the complainant's injunction as to all of the judgment injoined, except as to the sum of $1105 81, the aggregate amount of principal and interest due when the note sued on fell due, with interest on that sum from the 1st day of March, 1840, when said note was due, until paid, and the costs at law, and to dissolve the injunction with damages as to so much of said sum, with its interest and costs, as was due at the date of the injunction.

*Robinson & Johnson and Shy* for plaintiff: *Owsley & Goodloe and Pindell* for defendants.